Our last case of the day is number 2410287, American Southern Homes Holdings LLC v. David Erickson Mr. Hayden May it please the Court, Ed Hadden for American Southern Homes. That's all right, Your Honor. Many a football coach and teacher has said that same thing. Mr. Erickson makes two new arguments in his reply brief regarding the validity of the land purchase agreement. Specifically, he looks at the sentence in section 10 of that agreement that says, however, as to the phase C lots, within the first year, the parties will agree on the order that those lots are developed in. On page 8 of his reply brief, he cites the Burden v. Thomas case and he says that that sentence in section 10 is a special stipulation and thus, it's material and essential to the contract. When you read the Burden case, what they had there was a land purchase contract form and the form said, if you type in a special stipulation language, the typed in language takes precedence over the form language if there's a conflict. Well, there's no such takes precedence language in section 10 of the land purchase agreement. Black's Law Dictionary says that a stipulation is basically a condition. That's an argument that the district court rejected in the summary judgment order, document 209, page 18, note 4, where the judge said, listen, this isn't a condition like a condition precedent or a condition subsequent because you have to use special language under Georgia law that disfavors such conditions. We know the parties knew exactly how to write a condition because they did so in section 8.1 and 8.2 of the asset purchase agreement. You don't have to back up. Tell me which of the three claims you bring on appeal you're first arguing. Are you talking about the jury verdict on the LPA claim? Are you talking about if we reverse the verdict, then what happens about enforcing it? Put me in context.  Yes, Your Honor. All right. Tell me, what are we first arguing about? The judgment as a matter of law on the claim or the verdict? Where are we? Okay. What we're arguing is one of his arguments is that there is no contract at all and so That's if we reverse the verdict. No, ma'am. That is an argument that says, okay, even if we prevail on the prevention defense, it doesn't matter because there wasn't a contract to begin with and he says that there's not a contract because there was an agreement to agree on the Phase C lot development order and so to have a breach of the contract, which the jury found, there has to be a contract and we say there is a contract. He's saying there is a contract? Yes, Your Honor. So his argument seems to be that it's an agreement, an enforceable agreement to agree because the LTA includes an order of development? Right. So it seems to me that that argument works if the development order is an essential term of the contract. Correct, Your Honor. I'm assuming you are going to argue that it is not an essential term of the contract. You are correct. Can we get straight to that? Correct. All right. So one of the arguments about essentiality was the burden case that he sought his reply brief. He says because it's a special stipulation that makes it material. But the underlying argument is essentiality and in the Steele case, the Georgia Court of Appeals told us what essential terms are. The parties, we know that. The subject matter, which is the lots, we know that. The price that we are going to pay for the lots, we know that. That's in the formula price in the contract and essentially, clearly what we need is the takedown schedule. That's the key to the contract. It says the minimum number of lots, sea lots, that are going to be delivered. It says 15 lots and it goes up. It says exactly when the sea lots start. It says 15 sea lots and it doesn't even start until 2021. Right. And then 45 sea lots and it specifies the number of lots every quarter until 2028 or something like that. So you run out of sea lots. There are a lot of definite terms about the way the sea lot process is going to go. Yes, Your Honor. The one thing that's missing, they don't say, well, first of all, there's 1,600 lots and there are 964 sea lots. Yes, Your Honor. So we are doing A and B. There's no problem. It's all definite about that. We're down to C and we got the price. We got everything about C except out of the 9, we know there are going to be 15. It's to start per quarter, then go up to 45. We know that. We know everything about it. We just don't have, okay, lot number 822 is going to be in the first 15, a lot number. That's what we're missing. That's correct, Your Honor. And you're saying that's not material, not to make it unenforced. Right. That's the arm. Yes, Your Honor. Okay. I think we got that. Okay. So why are you appealing? Tell me what you're appealing. We're appealing the judge's denial of our judgment as a matter of law on the prevention defense because, okay, the jury said there is a breach of contract, okay, but then they found that there was prevention. Okay. So that gets to the prevention defense, which he said, you said, no, you can't do that. We got it as a matter of law, but it seems to me that there was a disputed issue of fact on that defense. You precluded them, your conduct was saying we don't got to agree, unless we agree to everything, we agree to nothing, that your conduct kind of prevented them from performing. Your Honor, that's their argument. One of those that the judge found, and that's what the evidence shows, is there was an issue of fact about all that. Well, there was an issue of fact on that, but that's not what the law is. The law of prevention is very narrow. The impossibility is very narrow. It's not difficult. It's not expensive. It's not not making a profit. It's impossible. And with respect... Well, let's say that following the notices of Liz Pendens made it impossible to develop the lots because it interfered with their title to turn it over to the city. Right. Well, that... What was your response to that? Well, there was evidence, wasn't there? Yes, there was evidence. And why isn't that sufficient under the law? Sure. Well, with respect to their two to three week before trial request to lift the Liz Pendens, it was only with respect to 40 of the 900 plus lots. And with respect to that, they said, what did he answer? Well, we didn't respond. Either refused or didn't respond. But the law is that we have to give a definitive response, that we would never lift it. And we did not do that. It's not in the evidence. There's no evidence of that. And with respect to the other 900 lots, they didn't even request that we lift it there. And so there's no evidence of a definitive statement that we are rejecting their performance. Under the Moody case, under the LDF family farm case, all that requires a definitive statement rejecting saying you can do whatever you want, but I will never accept your performance. That didn't happen. There's no evidence of that. You said this, the request to lift. In the past, there had been requests to lift Liz Pendens, and you had agreed to lift them. Yes, Your Honor. So what's at issue right now is this request that was done two to three weeks before trial. Yes, Your Honor. You didn't respond. You point to the fact that we're in the middle of trial prep. But you got two to three weeks before trial. You go into trial. You then have post-trial motions. At any point, did your client respond to the request to lift? No, Your Honor. There's a reason for that. On August 22, we, at the pre-trial conference, they demanded you have to elect remedy, specific performance or damages. And so we elected damages. And so at that point, we're not trying to get those lots. At that point, we're in litigation, and so we're focusing on that. And so at that point, when they sent that request with the 40 lots, we're not trying to get the lots. We're trying to get the damages remedied. Okay. Let me start from Liz Pendens' ground, they say, for why they couldn't perform. The other ground they assert is that you all were saying we've got to agree on the copyright, the licensing. That was going on, too. You all wanted an agreement about everything.  As part and parcel of the Lot C agreement. Have I got that right? That was one of the issues being negotiated, including Lot C. You're all right, and we've got to agree on everything. Everybody was talking about Lot C and what lots we're going to do in Lot C. But you all were talking at the same time about, well, you've got claims, copyright, license agreement. You've got multiple agreements, right?  And you all were talking about these other agreements, and part of Lot C agreement was tied up within the negotiations. Look, we've got to come to agreement about everything as part of the Lot C. Is that kind of what was going on? Yes, Your Honor, we were in agreement on everything. Therefore, because you were getting into all these other things as part of Lot C, that was preventing them from separating out Lot C. And let's just come up with, I mean, there's a whole bunch of lots left. All you've got to do is say, do these three here. You know it's going to be 15 this quarter. All you had to do was say, okay, let's do a separate agreement. And by that time, you had already been selling Lots A and B. You'd even sold some C, right? Yes, Your Honor. In the first year, maybe sold a few. And it wasn't until into 2021, it all broke down. And so they say you didn't perform. I'm not saying I agree or disagree. I'm just trying to understand.  They were saying that we were putting all the, he said that we were putting all these claims on me that are frivolous. That's true. We were trying to negotiate the whole thing. There was never an effort to say, here's just this, and we'll go with this. A whole bottle of wax, another. Your Honor, two answers to that. Two answers to that. One factual, one legal. The factual is we did break out and try to break out the Lots C development order. So let's just negotiate that by itself. And that was one of our, in our term sheet. And he said, yes, you said that. But he didn't believe it. He said, let's do it for now. Okay, so on one time, we did break it out and say, let's do that. But more importantly is the legal question. The legal question is, okay, the impossibility defense does not require the court to go in and say, was it difficult and were these claims worth a bunch or a little or was this hard to do? It says, was it impossible? In the Moody case we cited in our brief, there we had hotel owners in Atlanta who had defaulted on a note. They were trying to work it out with their lender. And the lender said, we want you to agree to everything. We have to have an agreement on everything before we modify the loan documents. There wasn't an agreement. Lender number two comes in and he says, by gosh, I want my money now. And they said, well, we were shocked. We thought it might be in bad faith. And the court said, no, that's not impossibility. It says, you knew that because they weren't modified, you had to comply with the original contract. Your Honor, there has been no way given, how should this have gone to the jury? Correct. Correct. Because your denial of your motion for judgment is a matter of law. Yes, Your Honor. All right. So I have a quick question and I'll ask it to the counsel as well. It sounds like a lot of this situation developed because people who were originally doing business together definitely seemed to have had a falling out. Have you all tried to mediate this case? Your Honor, there's been many attempts, including appellate mediation and others. Would it be helpful in any way if we were to direct the parties to try mediation? Well, we tried appellate mediation before and it did not work. Thank you. All right. So, Your Honor, I think my 10 minutes is up. And so I'll sit down and let my opponent talk right now. Good morning, and may it please the Court, Your Honors. I'm Kevin Elicker. I'm here on behalf of the defendants, Appellees Cross Appellants. I'd like to start where we left off. After five days of testimony, a jury of 12 citizens from Columbus unanimously found that Ash prevented the LPA sellers from performing under the Land Purchase Agreement. The primary appeal from Ash is that there just wasn't enough evidence of that, and there certainly was more than enough evidence for that. I'd like to begin, though, with this discussion of He's probably saying it's got to be impossibility. He's kind of raising the bar. Judge Hull, you took me exactly where I was going to go, which was this repeated reference to impossibility. Of course, we all know from contracts class in law school, impossibility is a distinct defense to enforceability under breach of contract. It's a different section of the Georgia Code that references impossibility as being a reason to void an obligation. The prevention defense here arises from Georgia Code Section 13-4-23, which refers to nonperformance, and it simply says that nonperformance caused by the conduct of the opposite party will excuse the other party from performance. Here, I would submit that the focus on impossibility strikes me as a backdoor argument about some kind of thing that should have been raised as a jury instruction issue. Of course, there's no challenge to the jury instructions here. The jury instruction that Judge Land gave simply said that where one party prevents another party from performing a condition, the party preventing the performance cannot claim that it has been injured as a result of nonperformance. If Ash felt so strongly that impossibility needs to be part of this instruction, it was incumbent on them to ask for it, and it certainly at this stage would have been incumbent on them to assign error to the absence of that. Absent that kind of articulation of the legal standard, what we had was the jury asked to make a common-sense factual determination. Did Ash's conduct prevent Mr. Erickson from performing? And as Judge Hull, you have noted, that's a very high standard. Here, there was plentiful evidence of that. We've already discussed some of it today. There's ample evidence that Ash refuted. The only reason I was focusing on that versus the Liz Pendens is because they did release the Liz Pendens to sell some C-LOTs. Have I got that wrong? Well, Your Honor, I think you might be conflating two things. The request to lift Liz Pendens, there was evidence that came out at trial that Mr. Erickson twice asked Ash to lift Liz Pendens as to C-LOTs that were tied up by the litigation and had not been sold or lands that would have been C-LOTs. The evidence that came out at trial was that that was land that would not have been used for home development. There was a right-of-way. Yes, that's correct. Yes. I spent a lot of time reading and trying to figure out what happened here at this trial because we're on a jury verdict.  That kind of makes what happened at trial more important. Well, I'll say I think there's any number of areas that the court can look at where a jury could find that Ash did prevent, right? And if you just go in chronological order of the parties' dealings, first and foremost, the parties did have this obligation to come to an agreement within the first year. I can discuss in a moment why we argue that's not enforceable, but even assuming enforceability, Ash, it is unrebutted, undisputed testimony that Mr. Erickson is the only party that made any effort to come to an agreement within that first year. But you don't argue it's unenforceable if you reverse the verdict. Well, I think that I would frame it as an alternative. These are different ways to get to the same judgment on count two. Would you find he just affirmed the error? Is that maybe the attorney's fees? Yes, that's correct. Your comments on the jury's verdict, because it's just nothing, and attorney's fees. I think that's correct. There is sort of a downstream practical consequence about whether the court could find that the contract is enforceable because it does have provisions. We're in 2025, and the contract has dates that go far out into the future, and so there is a practical implication about whether this contract is enforceable. We asked Judge Land to find that it was not enforceable. But I think for— He didn't do that. He did not, and that's—we've argued, you know, I can go into the— But your argument on enforceability is I thought it was if you reverse the jury verdict, then reach enforceability. I think the court can conceive of it that way. Okay. Mm-hmm. The brunt of the trial, Your Honors, really was about the back and forth during 2021 after there was this falling out, and I think that is where there is abundant evidence that the jury could find that Ash did prevent Mr. Erickson from performing. It was clear from Mr. Erickson's testimony that he needed the order of development for— Were you at trial, Joe? I was at trial, Your Honor. The trial was over. He was not. No. They're appellate lawyers.  He's an appellate lawyer. My friend, Mr. Kramer, on the end was at trial. And just having done hundreds of trials for 14 years, the jury didn't like anybody and they just left everybody where they were. I— I mean, that's kind of what happened. I— You know, they were requiring all this money, money, money. Everybody had money. Well— You were on the breach of contract. You get a dollar. You don't prevail. Yeah. I mean, it just kind of struck me that way as a compromised verdict to get a verdict. But maybe that's not a reversible error. It's just a reality of what happens. Well, Judge, I certainly don't think there was any error with respect to Count 2 and where it was, the questions the jury was asked and where they landed on this. Okay. With respect to—I won't belabor the point on the evidence. I do want to talk briefly about the enforceability question because I think that there was a bit—I just want to— I think the context of the land purchase agreement helps to explain why we end up in this conundrum over the lot C development order. Judge Branch, you had pointed out to my friend, really there's this question on whether the order of development is essential, right? There's not really any dispute that this language in Section 10 is an agreement to agree, right? On the very first page of their opening brief, they call it a mutual obligation to come to an agreement. But for purposes of this contract and the context of this case, we think that it is essential because it answers the questions, what lots will be delivered among the universe of C lots and when will that delivery occur? We keep referring to these— It starts in 2021 at a certain quarter and it's 15 at a time. And then it's very specific, 15 for a period of time each quarter. Then it goes up to 45. We know the price. We know everything. We need to know except just pick which lots. No. We don't know every—pricing. Can I— Yes, that's right. I can simplify. You know, you sell five bales of hay.  You're going to give me 20 bales of hay every quarter. Yes. And you're going to give me 45. And so we have to pick out which bales of hay are going. Yeah, well, and— So we don't have an enforceable contract. Yes, and just to clarify the issue here, under the land purchase agreement— I'm just saying that's the argument they make.  I think there's just a factual issue that has to come out about what we're talking about when we talk about C, quote, lots. The A lots are finished lots. And how are B? The B lots will be finished, capital F, finished lots within the first year. C lots are not lots. It is raw land. Yeah, there are a handful of some lots that were in development at the time of closing, and that's how— Some C lots got sold. Yes, but— In the first year, it seemed like the six months after the first year, which was puzzling to me, y'all were doing some C lot business. Y'all were selling C lots for six months after this November deadline, November 2020 deadline. Y'all actually sold C lots for the first part of 2021. The way the timeline was, closing was November— No, it's not. You were selling some C lots after the deadline for agreeing on the C lots. Yes, yes, yes. For about six months until everybody got all mad at each other and all problems. I think to clarify the point, we sold the C lots that had been developed. But it's still a C lot. It is. Well, yes, and the closing was in November of 2019. Under the takedown schedule, the first C lots aren't due for two years, two years. So the schedule or the order of development was supposed to be done within one year. The testimony at trial showed that it takes time to develop the land. And so, again, going back to the point that I think of it as A lots and B lots exist on a menu. The takedown schedule doesn't require ASH to pick only these A lots or these B lots. But they're going to have a menu of options when it comes time to take down 30 lots at a time. For C lots, that menu of options— Some of the C lots y'all were able to agree. It may have been because they were further in development or whatever the reasons. But for after the one-year 2020 period, the expiration of the one year to agree to agree, you were doing some C lots, selling some C lots. Yes, Your Honor. There were about— About how many? Maybe only about 20 or I don't know what it was out of the 900. The evidence, I think, is somewhere like 42 C lots. That's even more than I thought. What provision in the order of development would have made this so that you lose this argument? What would have provided more specificity so that you're no longer able to order— to argue that there is an agreement to agree? What Judge Hall has talked about, there were a lot of specific parts in the agreement of the development order. What is missing that is fatal? I think, Your Honor, if the parties had inked and put into writing the order of development conceiving of, you know, there are a dozen or so subdivisions identified as what will be the future sites of these C lots. If they had— Can you identify the parcels? That's the only way it becomes specific enough? No, Your Honor. What I was suggesting was if they had put into order, you know, phase— in the first phase of our development, we're going to develop Lexington Hills, and then we're going to do Garrick Pines. And then that way, what I'm trying to come up with is if there's something where there was a dispute about whether a particular subdivision had to be ready by a particular quarter, there could be some kind of general principle of regular performance or something that a court could read into it to say, well, you guys did agree on the order in which it was, and you knew that starting in September of 21, you'd have to deliver 15, and so you would at least have to have, you know, the subdivisions far enough along so that you could— So let me get this straight. So you've got a contract provision that sets forth the order of development that arguably allows your client, Mr. Erickson, to have some discretion in which lot gets developed when. And within that discretion, it would make it very hard for ASH to sue Mr. Erickson for not developing this one subdivision, this one subdivision, because he would come back and say, well, I get to pick, and I'm picking, and I'm doing this subdivision because that's what I picked. So your complaint seems to be that a contract that gives him some control, in fact, it shouldn't have given him that control, that it should have told him which subdivision to develop when. I think the short answer to the question is yes, but the contract does—nothing in the contract is written as it stands to give Mr. Erickson discretion to tell ASH which lots it can buy. The contract is written— It gives him discretion to choose which lots to develop. It's silent as to his—it just says— It tells him to develop lots on this timeline, so doesn't that necessarily imply that within this stable of C lots, he can start developing these five? Well, no, Your Honor, because Section 20 of the LPA is where ASH is supposed to give 10 days' notice before the end of the quarter of which finished lots it wants to take down, and that's where I was getting to the point with the A lots and the B lots. They exist on a menu. There's a menu of finished lots that everyone agrees they will be finished at the time that the takedown can happen, and ASH gives notice of which of the lots it wants to take down. There's no such—there's nothing in the contract that puts forward an opportunity to create that. That is the purpose of Section 10, and that's what the testimony was that came out of trial is why Section 10 was put into the agreement was because Mr. Erickson was not— nobody acted as though Mr. Erickson had that discretion. I mean, certainly at the end of the day, ASH filed a lawsuit against Mr. Erickson claiming he breached Section 10 by failing to come to an agreement. They never said to him, just pick whichever lots you want. We don't, you know, use your discretion. Before you sit down, do you want to talk about your cross-appeal? Yes. Yes, Your Honor. I'll cut to the chase on attorney's fees. Our point on the attorney's fees issue is that Mr. Erickson, the cross-appellants prevailed on both the trademark and the copyright issues. I think there's no dispute that Judge Land, he cited the wrong legal standard for Lanham Act fees. Tyre Kingdom is obligated by this Court's decision in Tobinick, and our position is that his decision seemed to hinge on his bottom line conclusion that there's no evidence of bad faith. That is the crux of the precedent. The statute is May. It is. Both statutes are May. It is May, and that's why—and that's, if I can briefly sum up, that's why the standard is abuse of discretion, but, of course, applying the incorrect legal standard is, by definition, abuse of discretion. But isn't formality something you can look at? It may not be the touchstone in these type of statutory claims as opposed to just general, you know, Georgia law and all that business. Yes. I think under Tobinick, this Court explained that exceptional case means one that stands out from the others, and in the course of Tobinick, the Court said we are no longer applying the requirement to find bad faith. I think our position is when you combine a citation to a case that stands for that obligated bad faith principle, and then you look at Judge Land's conclusion that, simply put, there was no evidence of bad faith, we don't think the Court can, on that basis, affirm what Judge Land did and certainly could vacate and remand for application under the proper legal standard. Thank you. With respect to the provision defense, they are trying to say that it's separate from impossibility. Well, Georgia law is that prevention under 13.423 means there's a repudiation, that performance is rendered useless or it's impossible. And so what they were arguing here, what we're arguing, it's not impossible. Useless would be I can't use this lot because it's been condemned. I can't use this lot. It's not zoned right. But what they're talking about is it's impossible. And the cases like LDF Family Farm, like Moody, talk about negotiations going back and forth, but the negotiations don't make things impossible. It might make it difficult. It might put some pressure on you, but it doesn't make it impossible. And they look for a definitive statement that you can't do it. We won't accept your performance. And that is prevention under Georgia law 13.423. And so when that is the standard and it's a narrow standard, none of these facts matter because we never raise to the level of impossibility. With respect to the Crimer case, that is the essentialness of the law development order, they had an agreement to agree in that case too. It was a divorce settlement which treated it as a contract. And in that divorce settlement, they said, okay, you have to take all the stock that's not in retirement accounts. You have to divide it equally based on after-tax value. So all the stock, after-tax value. In our case, it's all the C lots in the formula price. And so that's the main terms, and you can pick which ones you want to develop first here and there. But the bottom line is that's a particular detail. We know you can do them all. We know what we're going to pay for them. And you agreed to that. And that's the overall agreement. Your Honor, we would say that the reason that the jury instruction doesn't matter here is because JML means you never get to the jury. JML says before, if you grant JML, we'd have never gone to the jury. And so we're saying there's not a jury tribal issue here. And so there was no evidence of the high standard of provision under Georgia law, no substantial evidence of that. You don't get to a jury, you don't get to a jury instruction. And our bottom line answer is, Your Honor, we paid a $6.4 million premium for the exclusive right to buy all the lots. We paid $2.5 million deposit to buy the C lots. He took our money. He didn't give us the lots. And that's a breach of contract that the jury found. And we don't think that should be taken away from us because of a misinterpretation of Georgia law on the JML ruling. Did they give you the dollar on that or they gave them the dollar? I don't remember. Who got the dollar? You got a dollar? We got a dollar. You got a dollar. Yes, ma'am. And that's what I meant to what I thought the jury did. But not on the breach of contract. Because I assume you were here this morning, I did not marry Mr. Hayden, but I did know him when I had my Senate confirmation because he worked in the United States Senate for quite a long time. So if you got confirmed in the 90s, you knew Mr. Hayden. And I do know that. So I just wanted to take the role. Well, I hope that the panel's opinion is as successful as your confirmation was. That's very clever. I'm done. Thank you. Thank you. All right. Court is adjourned until 9 a.m. tomorrow morning. All rise.